UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CASE NOS. |
| v. | : | 1:24-CR-151-1-ELR |
| | : | 1:24-CR-188-1-ELR |
| EFRAIN GONZALEZ SALGADO, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Efrain Gonzalez Salgado ("Mr. Gonzalez") respectfully submits

this Sentencing Memorandum to assist the Court in determining a reasonable

sentence pursuant to 18 U.S.C. § 3553(a).

## BACKGROUND

Mr. Gonzalez comes before the Court for sentencing in a criminal case. He

has no prior convictions outside the charges in this case. He has lived in the U.S.

for well over 20 years, raising a young family. He is a lawful permanent resident,

and his wife and daughters are U.S. citizens.

Mr. Gonzalez operates a successful restaurant, Sabor a Mexico, which had

two locations and a plan to open a third before this case began. After the media

attention this case generated, the landlord for one of his restaurants terminated the

lease, and the plans for the third location were put on hold indefinitely. Only the

original restaurant in Fayetteville is operating today.

While he has always had good intentions, Mr. Gonzalez is here because he has taken shortcuts in life. When his restaurant was struggling to get off the ground in 2016, Mr. Gonzalez agreed to act as a courier and deliver bulk cash to what turned out to be an undercover agent in a federal investigation. In times of staff shortages, including during the COVID-19 pandemic, Mr. Gonzalez hired unauthorized aliens to work at his restaurants. As a result of taking these shortcuts, Mr. Gonzalez has pleaded guilty to bulk cash smuggling under 31 U.S.C. § 5332 and hiring unauthorized aliens under 8 U.S.C. § 1324(a)(3).

As the Court is aware, however, Mr. Gonzalez was not initially charged with these offenses. He was indicted in the Southern District of Texas in 2021 and charged with money laundering offenses based on the 2016 transaction. Because Mr. Gonzalez did not know that the cash he was transporting was proceeds from drug trafficking, he entered a plea of not guilty and was set for trial.

Before a trial could take place in that case, however, Mr. Gonzalez and his wife were arrested in this district and charged with forced labor and alien smuggling. The Government alleged that the Gonzalezes brought people to the U.S. from Mexico illegally and enslaved them at their restaurants, forcing them to work without pay and live under poor conditions and the threat of deportation. The Gonzalezes pleaded not guilty and were detained without bond pending trial.

2

The defense conducted a robust investigation in this case. Through that investigation, the defense has obtained a mountain of evidence not only directly disproving the allegations in the Government's original indictment, but also proving that the alleged victims and other Government witnesses conspired with each other to fabricate these allegations against the Gonzalezes to gain benefits, including money, housing, and legal immigration status reserved for crime victims.

The evidence obtained by the defense was extensive, credible, and to date uncontroverted. The evidence showed that workers were well-compensated, given ample break time, lived in suitable housing, and that they had the liberty to socialize with each other and live normal lives outside of work. The evidence also showed that the alleged victims had conspired and coordinated with each other to make false allegations of human trafficking against Mr. Gonzalez to receive legal immigration status and other benefits, and they used those benefits to recruit other former employees of the Gonzalezes. Among other things, the defense's evidence includes:

- Recantations: Multiple alleged victims in this case have recanted their allegations against Mr. Gonzalez and his wife. In January, Individual 2 (referred to as "Victim 2" in the indictment) contacted defense counsel and flatly denied that he was ever forced to work for Mr. Gonzalez, rent housing from him, or that he was ever threatened by him. Individual 2 also denied ever having to "escape" Mr. Gonzalez's restaurant, directly contradicting the Government's allegations. Individual 2 admitted to making other false statements to the Government.

3

Another Government witness, HB, who the Government discussed at the detention hearing, also recanted. In early 2024, HB called Mr. Gonzalez's mother and confessed to making false allegations, suggesting he and other workers did so to gain legal status. He suggested he made the allegations against Mr. Gonzalez under duress from the Government. (Exhibit 1, Transcript of Call from HB (Translated)).

- Defense Interviews: The defense contacted and interviewed over 30 witnesses, including current and former employees of Sabor, regular customers of the restaurant, law enforcement agents, other employers who employed the alleged victims, and the alleged victims themselves.

  The defense interviewed dozens of former and current employees of Sabor a Mexico, including several who worked alongside the alleged victims and were their close friends and roommates. Each of them directly contradicted the Government's allegations, and several of them were aware that the alleged victims were making false allegations to gain legal immigration status. Some of these witnesses submitted signed declarations. (Exhibit 13).

  The defense also interviewed business owners who know Mr. Gonzalez and employed the alleged victims after they left Sabor a Mexico. The alleged victims admitted to these employers that they were making false allegations against Mr. Gonzalez to gain legal status. One even told his employer that he had nothing against Mr. Gonzalez personally, but that he "needed papers." Another employer testified at Mr. Gonzalez's bond hearing that some of the Government's alleged victims were coaching each other with what to tell the Government's agents. (Exhibit 2 and 3, Interviews with Employers).

  The defense attempted to interview several of the alleged victims. Several initially indicated that they were willing to speak to the defense but suddenly became unavailable or inaccessible. It appears some of the alleged victims were intimidated others to ensure they did not speak to the defense. Some alleged that the Government had instructed them not to speak to the defense.

  Through interviews, the defense was able to obtain additional evidence, such as messages and other evidence that the alleged victims had been recruiting other employees to join the investigation against Mr. Gonzalez by promising they could get immigration status and benefits. (Exhibit 15).

- <u>Depositions</u>: Three defense witnesses were deposed, and each of them personally knew the alleged victims (some had even worked together in Mexico). These witnesses gave credible and uncontroverted testimony contradicting the Government's allegations. These witnesses also testified that they were intimidated and threatened by agents when they would not corroborate the Government's allegations. (Exhibit 4-6, Depo Transcripts).

- <u>Wire Transfers</u>: The defense obtained records from several bodegas, shops, and other businesses that the alleged victims and other employees used to send money to people in Mexico. Contradicting claims that Sabor employees were not paid or were severely underpaid, wire transfer records obtained by the defense showed that they were paid well and able to send thousands of dollars to their family and friends in Mexico. As reflected in some of the text messages produced by the Government, the Gonzalezes even gave the alleged victims and other employees rides to the bodegas or helped their employees wire money when the employees couldn't do it. (Exhibit 7).

- <u>Social Media and Text Messages</u>: The defense obtained a significant volume of messages between the alleged victims and the Gonzalezes and reviewed hundreds more that the Government produced in discovery. These messages contradict the alleged victims' allegations in several ways. Most importantly, the alleged victims who claimed that they were threatened and scared of Mr. Gonzalez had extensive communications with him that contradicted their allegations. One of the alleged victims sought to return to work for Mr. Gonzalez at his new restaurant, for example. In other conversations, Mr. Gonzalez encourages his former employees and is friendly with them.

  The defense also obtained evidence from social media accounts reflecting that, during the time they claimed to be enslaved by the Gonzalezes, the alleged victims were able to travel freely, socialize wherever they wanted and with whoever they wanted, call out of work sick (or hungover), and otherwise live "the American Dream."

  Their social media activity also contradicts specific allegations. Evidence shows that "Victim 2" was working in Texas on an expired visa during a time he told agents he was in Mexico being recruited to come and work for Mr. Gonzalez. Another post shows "Victim 4" traveling by airplane at a time when he told agents he was forcibly smuggled into the U.S. (Exhibit 8-12).

5

- Public records: The defense also obtained evidence through public records which, in conjunction with other evidence, contradicted the Government's allegations. Most visibly, for example, police records and other evidence completely disprove the Government's allegations that the Gonzalezes traveled to Mariachi's, another restaurant, to threaten the alleged victims who worked there and demand repayment of their debts.

  The evidence shows that the Gonzalezes had permission from the owner of the restaurant to come and speak to their former employees, which they did so in a civilized manner and then left. It was not until hours later when another Government witness arrived at the store and called the case agent in this case to manufacture accusations of harassment and trespassing.

  Other public records reflect that one of the Government's star witnesses, GO, has a warrant for his arrest for robbery pending in Mexico, a significant incentive for him to claim he is a victim entitled to legal immigration status.

  Records produced by the Government also show that several of the alleged victims who claimed to be forcibly smuggled into the U.S. by Mr. Gonzalez were apprehended by border patrol on their first attempts to enter illegally, sent back to Mexico, and then promptly crossed back into the U.S. Another alleged victim, "Victim 1" was apprehended for illegal entry after he left Sabor and before he joined the investigation against Mr. Gonzalez.

The defense produced most of this evidence to the Government and asked the Government to dismiss the charges in the indictment. The Government did not follow up on the evidence produced by the defense or continue its investigation in any meaningful way. Instead, the Government offered to dismiss the charges in the indictment if the Gonzalezes agreed to plead guilty to lesser offenses, primarily offenses relating to hiring unauthorized aliens at their restaurant. Having served a year in pretrial detention, separated from their children, the Gonzalezes agreed.

In late May 2024, Mrs. Gonzalez pleaded guilty to harboring under 8 U.S.C. § 1324(a)(1)(iii) based on her hiring unauthorized aliens and providing them with housing and transportation. In exchange, the Government dismissed the charges in the indictment against her and recommended a sentence of time served, which the Court accepted. Mrs. Gonzalez was released from jail in August 2024.

For his part, Mr. Gonzalez agreed to consolidate his case in Texas with the case in this district and pleaded guilty to bulk cash smuggling and alien harboring to resolve both cases. The plea agreement contemplated a contested sentencing hearing, however, where the Government stated it would argue for multiple enhancements based on the allegations underlying the soon-to-be-dismissed indictment and advocate for an upwards variance from the Guidelines range.

In preparation for the hearing, the defense objected to the PSR's inclusion of these allegations and the application of these enhancements. The defense prepared and served subpoenas on the alleged victims and other Government witnesses, including the lead agent in this case. When the Government became aware that the defense had subpoenaed this agent and sought to question him at sentencing, the Government informed the defense that it would no longer seek to prove any of the allegations of labor trafficking or other offenses as "relevant conduct" and would inform Probation that the Government would no longer seek the enhancements.

Ultimately, the parties renegotiated the plea agreement to allow Mr. Gonzalez to plead guilty to hiring unauthorized aliens under 8 U.S.C. § 1324(a)(3) rather than harboring under § 1324(a)(1)(iii). The distinction between the charges is important to Mr. Gonzalez, who has a green card. Harboring is an aggravated felony requiring deportation upon conviction; hiring unauthorized aliens is not.

The cost of reducing this charge was significant—pursuant to the new plea agreement, Mr. Gonzalez has agreed to a joint recommendation of 48 months in prison and given up his right to request a lower sentence. Detained without bond and presented with an opportunity to resolve both of his federal cases without a trial and remain in the U.S. with his family, Mr. Gonzalez is willing to pay that cost and asks the Court to accept the plea agreement.[1]

Mr. Gonzalez has accepted full responsibility for his offenses, and he is genuinely remorseful for any harm he has caused. This case began with allegations that Mr. Gonzalez was a human trafficker and money launderer, however, and that was how he was initially presented to the Court. As reflected by evidence obtained by the defense and the lack of evidence presented by the Government, he is neither and never was. It is important for the Court to know that when it sentences him.

---

[1] Under Rule 11(c)(1)(C) and the terms of the plea agreement, Mr. Gonzalez has the right to withdraw his guilty plea if the Court intends to sentence him above 48 months. The Government does not have a similar right to withdraw if the Court deviates from the recommended sentence.

**THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary," after considering several factors, including the nature of the offense and the history of the defendant. As noted, the parties have agreed to make a recommend a 48-month prison sentence in this case, and Mr. Gonzalez will honor his obligations in the plea agreement. Any time beyond those 48 months would be much "greater than necessary" under § 3553(a).

I.    Nature of the Offenses

As noted above, this case was not what it seemed when it first came before the Court in 2023. Nor is this case the one it was when it was indicted in 2021 in the Southern District of Texas. Reflecting that reality, Mr. Gonzalez did not plead guilty to the original charges in those cases.

Faced with a struggling business in its infancy, Mr. Gonzalez agreed to act as a courier of bulk cash in 2016 that he knew was destined for Mexico and had not been taxed. He did not know where the money came from, or where exactly it was going, but he knew he was doing something wrong. He admits that and is sincerely remorseful for his participation in that offense.

In 2021, like many small businesses in this country, especially in the food industry, Mr. Gonzalez's restaurants were facing severe labor shortages during the

9

pandemic. In fact, Mr. Gonzalez and his restaurants had been featured on Univision in 2021 discussing the labor shortage. Unfortunately, Mr. Gonzalez again showed poor judgment and hired a large number of unauthorized aliens to work at his restaurants. The evidence makes clear that Mr. Gonzalez never mistreated these workers, however, let alone enslave them.

While he has pleaded guilty to "lesser offenses," Mr. Gonzalez admits that he has made serious mistakes and betrayed the trust of his family, his community, and the country he loves. Mr. Gonzalez's offenses were a result of poor judgment and "cutting corners," however—he is not the monster he was initially alleged to be by the Government when it brought the original charges against him. He is now committed to accepting the consequences of his action and making things right.

Finally, at the Government's behest, the PSR includes information regarding other cases or investigations involving Mr. Gonzalez. The PSR references the Government's previous accusations in Court that Mr. Gonzalez and his wife were charged with drug possession and sexual assault in 2018. The PSR is technically incorrect that "an accusation was filed" and then dismissed—the alleged victim in that case underwent a rape kit that did not corroborate her allegations against Mr. Gonzalez, and the State never even filed an accusation or presented the allegations to a grand jury. The State simply dismissed the arrest warrants.

The PSR also alleges that, during a wiretap investigation in 2014, agents allegedly intercepted Mr. Gonzalez on a call with subjects of a drug investigation. The PSR alleges the agent who summarized these calls, which are not described in the PSR and were never produced to the defense, believed that Mr. Gonzalez and/or these subjects were "speaking in coded language about drugs."

To the extent the PSR suggests that Mr. Gonzalez was involved in a drug conspiracy, the Court should reject these allegations. Counsel has not seen any reliable evidence that Mr. Gonzalez was involved with drugs or was discussing drugs on any of these alleged calls, which the Government never produced. The PSR does not summarize the calls or "coded language," nor does it state whether the agent interpreting them was fluent in Spanish or familiar with Spanish slang.

For the reasons outlined above, Mr. Gonzalez has pleaded guilty to bulk cash smuggling and hiring unauthorized aliens, the only offenses he committed. He should be sentenced for those offenses. Nothing more, nothing less.

II.    History and Characteristics

The Court is familiar with Mr. Gonzalez by now, having sentenced his wife last year and hearing his daughter's testimony at the detention review hearing in 2023. Above all else, Mr. Gonzalez is a family man, dedicated to his wife, his daughters, his brother, his mother, and the rest of his family in the U.S. and abroad.

Mr. Gonzalez overcame a great deal to come to the U.S. over 20 years ago and build a life here. The evidence in this case reflects that, for better or worse, and often to his own detriment, he has extended a hand to others who came to this country to build a better life for themselves, often starting from scratch like he did.

More than anything else though, Mr. Gonzalez's character is reflected in the character of the daughters he has raised. One is a rising senior at Starr's Mill High School and aims to be a neurosurgeon. His younger daughter is also in high school but wants to be a lawyer one day, at least for now. Mr. Gonzalez's daughters are hardworking, honest, and kind—qualities Mr. Gonzalez has in spades.

Current and former employees of Mr. Gonzalez's restaurants, even some of the Government's own witnesses, have said as much, with several describing Mr. Gonzalez as a "mentor" who offered them a better life than they had in Mexico. During the depositions, some of these employees became emotional testifying about the opportunities Mr. Gonzalez had given them.

While he has spent most of the last two years in jail on false charges of human trafficking, Mr. Gonzalez understands that he is not wholly innocent. He admitted to the offenses he committed and has accepted responsibility for them. Mr. Gonzalez also accepts that his actions have consequences, and he prays for an opportunity to redeem himself and prove his worth to the country he loves.

## CONCLUSION

Consistent with the terms of the plea agreement, Mr. Gonzalez submits that a 48-month term of imprisonment followed by one year on supervised release would be a reasonable sentence in this case and that any additional punishment would be "greater than necessary" under § 3553.

This 23rd day of May, 2025.


THE CHURCH LAW FIRM, LLC                    SCHERCK BAKER, LLC

/s/ Thomas D. Church                        /s/ Whitney S. Baker
Thomas D. Church                            Whitney S. Baker
101 Marietta Street SW                      101 Marietta Street SW
Suite 3300                                  Suite 3300
Atlanta, Georgia 30303                      Atlanta, Georgia 30303
(404) 223-3310                              (404) 423-1110
tom@church.law                              whitney@scherckbaker.com

## CERTIFICATE OF SERVICE

This is to certify that on this day, I electronically filed the foregoing pleading with the Clerk of Court using CM/ECF which will automatically send email notification of such filing to all counsel of record.

This 23rd day of May, 2025.

THE CHURCH LAW FIRM, LLC

/s/ Thomas D. Church
Thomas D. Church
101 Marietta Street SW
Suite 3300
Atlanta, Georgia 30303
(404) 223-3310
tom@church.law

SCHERCK BAKER, LLC

/s/ Whitney S. Baker
Whitney S. Baker
101 Marietta Street SW
Suite 3300
Atlanta, Georgia 30303
(404) 423-1110
whitney@scherckbaker.com